Kristin Booth Glen, J.
(dissenting). As the Supreme Court has repeatedly held, "the Double Jeopardy Clause protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense” (United States v Halper, 490 US 435, 440 [1989]).[1] Like the instant case, Halper involved the third of these protections, more specifically a civil forfeiture following criminal conviction. The Court held that a defendant who has already been punished in a criminal proceeding may not be subject to an additional civil sanction where that sanction may not fairly be characterized as remedial, but only as a deterrent or retribution. (Supra, at 448-449.)
In determining whether a civilly denominated postconvic *576 tian sanction or forfeiture would trigger the Double Jeopardy Clause, the Court specifically held that "the labels 'criminal’ and 'civil’ are not of paramount importance.” (Supra, at 447.) Rather, the Court wrote: "while recourse to statutory language, structure, and intent is appropriate in identifying the inherent nature of a proceeding, or in determining the constitutional safeguards that must accompany those proceedings as a general matter, the approach is not well suited to the context of the 'humane interests’ safeguarded by the Double Jeopardy Clause’s proscription of multiple punishments * * * This constitutional protection is intrinsically personal. Its violation can be identified only by assessing the character of actual sanctions imposed on the individual by the machinery of the state.” (Supra, at 447; emphasis added.)
The Housing Court Judge below misread or ignored this specific language in holding: "The Double Jeopardy clause is not a defense to [a] holdover proceeding, commenced under RPAPL 711 (5). RPAPL 711 (5) is a civil statute whose remedy is civil in nature. The remedy under this statute is a possessory judgment. A possessory judgment is not a civil sanction or form of punishment * * * The statute is not designed for retributive or deterrent purposes”.
Halper (supra) requires an individualized determination, based on the particular facts of the case. Such determination, in turn, depends upon a showing of the remedial effects or purposes served by application of the civil sanction or forfeiture to those facts. Because the court below failed to make such an inquiry and determination, its denial of respondent’s motion to dismiss, based solely on its characterization of the applicable statute, was error, and requires reversal.
However, nothing would be gained by reversal and remand, since the record here is sufficiently complete to permit the required inquiry to be made, and to conclude that this is, as was Halper (supra), the "rare case * * * where a fixed-penalty provision subjects a * * * small-gouge offender to a sanction overwhelmingly disproportionate to the damages [she] has caused.” (United States v Halper, supra, at 449.)
FACTS[2]
At the time of this proceeding, respondent Valerie Wright (Wright) was the 26-year-old mother of two children, ages one *577 and two. Prior to their birth she was employed full time; thereafter she received public assistance. She had been living in the subject premises[3] for a year or two; in the late fall of 1991 she took a roommate, Sherall Bradley (Bradley), and Bradley’s two children. Bradley contributed $100 per month to the rent.
On March 19, 1992, pursuant to a search warrant, the police searched the apartment and arrested both Wright and Bradley. In the course of the search the police recovered a quantity of crack cocaine, a gun and ammunition, $631 in bills of various denominations, and a yellow plastic bag containing 35 empty vials, the latter presumably intended for packaging drugs. All but the bag of empty vials were recovered from dresser drawers in the bedroom occupied by Bradley.[4] The bag was found on top of a kitchen cabinet in the kitchen shared by Bradley and Wright. Wright testified that she did not know the bag was in the kitchen and had no knowledge of its contents.[5]
Both Wright and Bradley were charged on criminal complaints and subsequently indicted for criminal possession of a controlled substance in the third and fourth degrees, criminal possession of a weapon in the fourth degree and two counts of criminal use of drug paraphernalia in the second degree. On April 16, 1992, Wright was permitted to plead guilty to a single count of attempted possession of a controlled substance in the third degree and was sentenced to a five-year term of probation. Wright agreed to the plea to avoid going to jail, because she "wanted to take care of [her] kids.”
Following the arrest, Bradley moved out and has not been in the apartment since. According to her probation officer, Wright has been a model probationer, who has "been a responsible parent and has followed all probation directions,” including passing all the randomly imposed drug tests which *578 are part of her probation conditions. Prior to the eviction proceeding and her ultimate eviction, Wright also became active in her block association, winning the admiration and appreciation of its president and her neighbors.
Sometime subsequent to her conviction, the District Attorney’s office initiated the eviction proceeding which is the subject of this appeal.[6] On July 30, 1992, more than four months after the arrest, and two months after her conviction, Wright was served with a petition which was based solely on the evidence used to convict her in the criminal proceeding. She moved to dismiss on double jeopardy grounds; the court denied her motion for the reasons stated above.
At trial the evidence adduced (through one of the police officers who participated in the search and arrest) was, again, solely that of the crime with which Wright was charged and for which she had already been punished. Based only on that evidence, the court granted a judgment of eviction. Significantly, although the trial was held on September 16, 1992, the warrant was stayed to October 31, 1992,[7] "because of the children.” Subsequent applications for stays were denied; as a consequence Wright and her two children were evicted and rendered homeless.[8]
*579 DISCUSSION
There can be no question that Wright has been twice affected by the same sovereign,[9] based solely on the same criminal acts. The first, a criminal prosecution, resulted in Wright’s criminal conviction and the second, an eviction proceeding brought pursuant to RPAPL 711 (5) resulted in the loss of Wright’s low-rent apartment and her and her children’s subsequent homelessness. The question, under Halper (supra), is whether the latter action, notwithstanding the statute’s general remedial purpose, was on the facts of this case, punitive.
The individualized determination compelled by Halper (supra) thus involves a two-part analysis. First, it must be ascertained whether the civil sanction, as applied, had a compensatory or remedial goal and, if so, whether the sanction sought was nevertheless so disproportional to the offense committed as to constitute a prohibited second "punishment.”
A. There Was Little Or No Remedial Purpose
Although, as the Housing Court Judge held, RPAPL 711 (5) is generally a remedial statute, whose purpose is "to protect the interests of other tenants in the building from occupants engaging in or allowing their apartment to be utilized for prostitution, illegal trade or manufacture, or illegal business,” there is no support in the record for a remedial purpose for, or effect of, Wright’s eviction. To the contrary, all the tenants in the building stated their belief that Wright was no problem and that her continued tenancy constituted no danger to them.[10] In addition, the superintendent of the building reported no difficulty with Wright’s tenancy, and stated that there had been no complaints.
*580 While eviction of persons dealing in drugs clearly serves a remedial purpose, there is no evidence in this case that Wright ever did so — at most, she acquiesced in Bradley’s possession of drugs — nor that after her arrest and Bradley’s departure, drugs were ever present in her apartment. Indeed, the conditions of Wright’s probation and her susceptibility to continuous governmental surveillance make it extremely unlikely that she would ever bring illegal drugs into her apartment, much less sell them.[11]
The leisurely timing of the eviction proceeding — some four months after the arrest — and the source of its instigation — the District Attorney’s office, not anyone connected with the building or its management — further demonstrates that its purpose was not remedial, but rather a second punishment for the same offense.
Finally, although no other remedial purposes are seriously advanced, it is worth noting that none which figure in other post-Halper (supra) cases are present here. Certainly, unlike Halper,[12] the forfeiture of Wright’s tenancy did not "compensate” the City for the costs of drug enforcement. If anything, it cost the City money, both through lost rent[13] and through the far greater sums which will be incurred in processing Wright and her children through the shelter system.

*581
B. The Penalty Was Entirely Disproportionate

Based on the facts and the discussion above, it would appear that there was little or no remedial purpose to Wright’s eviction and that the analysis could end on a finding that, in this case, eviction was not remedial, but was rather entirely punitive and/or deterrent. However, even if some remedial purpose were served — precluding the remote possibility that Wright might someday be involved with drugs again — the disproportionality analysis required by Halper (supra)[14] requires a finding that the Double Jeopardy Clause has been violated.[15]
In Whalers Cove (supra), the Second Circuit found that the civil forfeiture of a condominium in which the defendant had a $68,000 equity following two cocaine sales in the amount of $250[16] was overwhelmingly disproportionate to the value of the relevant drug transactions, and so created a rebuttable *582 presumption that the forfeiture was punitive in nature.[17] (Supra, at 37.)
While the loss of a familiar apartment which has been one’s home, and where one has raised one’s children is enormous, the loss is compounded beyond calculation when homelessness is the consequence. The effects of homelessness and consignment to the shelter system on families such as Wright’s have been so frequently discussed and well documented that they need not be repeated here. (See generally, McCain v Dinkins, 84 NY2d 216 [1994]; Matter of Kelly v Bane, 192 AD2d 236, 242 [1st Dept 1993].) Whatever monetary value could be placed on such a loss is certainly greater in real terms, as well as proportionally, than the loss of a $68,000 equity to a middle class person. Accordingly, I find that the eviction was so disproportionate to any remedial benefit as to render it a constitutionally proscribed second punishment.
One final point must be made. The City argues, and the majority seems to assume, that if Wright’s eviction is held to have violated the Double Jeopardy Clause, the City will be powerless to evict drug dealers and "protect the safety and plight of other tenants living in [their] buildings.”[18] This is, of course, parallel to the argument propounded by the Government in Halper (supra) and rejected by the Court there. Like the Federal forfeiture program in Halper, the City is free to pursue its civil penalties, including drug related evictions, against persons involved in the drug trade, including those actually convicted. Many evictions subsequent to criminal *583 punishment will be rationally related to the remedial goals of the statute. It will be the "rare case” (United States v Halper, supra, at 449) in which a tenant is able to marshall facts as compelling as these in overcoming the generally remedial purpose and effect of RPAPL 711 (5).[19]
Where, however, as here, the "humane interests” protected by the Double Jeopardy Clause are so powerfully implicated, the City’s unfettered discretion must cede to that constitutional imperative which is the mark of the just and humane society to which we aspire.
I would, therefore, reverse the judgment below and remand to HPD to locate a comparable apartment for respondent-appellant.
Parness, J. P., and McCooe, J., concur; Glen, J., dissents in a separate memorandum.

. New York State Constitution, article I, § 6 contains a similar proscription. This independent State constitutional protection, presumably coterminous with its Federal counterpart, was raised by respondent below, and considered by the Housing Court Judge. Although no reported case has interpreted our Double Jeopardy Clause after Halper (supra), in other areas it appears to be at least as broad as the Federal clause (e.g., People v Perez, 169 AD2d 654 [1st Dept 1991]). Significantly, the statutory double jeopardy protection contained in CPL 40.30 has been construed as broader than Federal constitutional protection. (See, Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 40.30, at 343.)

. Unless otherwise noted, these "facts” are undisputed.

. The building has 10 apartments, 6 of which were occupied by tenants with leases, like Wright, 2 by squatters, and 2 were vacant. The building is owned by the City of New York, presumably as the result of an in rem proceeding, and run by its Department of Housing Preservation and Development (HPD).

. Bradley told the police where the drugs and other contraband could be found.

. Wright candidly admitted that she had seen Bradley with drugs, but denied any knowledge of drug sales. As such, Wright could not — and did not —claim to be an entirely innocent occupant who had no knowledge of or acquiescence in drug activity (cf., New York County Dist. Attorney’s Off. v Pizarro, NYLJ, June 24, 1993, at 24, col 6 [App Term, 1st Dept 1993]).

. The record indicates that the District Attorney’s office forwarded a report of her conviction to the City/HPD. Presumably this was done pursuant to RPAPL 715, which permits law enforcement officials, among others, to serve notice on landlords that their premises are being used for illegal purposes. If the landlord does not timely commence an eviction proceeding, section 715 permits the District Attorney to do so in his stead. RPAPL 715 has been characterized as a major means to combat "the drug explosion that had become a cancer in the life of residents of * * * the City of New York and the United States as a whole.” (Chan v Rivera, NYLJ, May 17, 1989, at 26, col 5 [Civ Ct, Kings County 1989]; accord, New York County Dist. Attorney’s Off. v Rodriguez, 141 Misc 2d 1050, 1052 [Civ Ct, NY County 1988] ["program created by the prosecutor’s office and other governmental agencies designed to evict drug dealers from residential and other real property”].) Because the landlord here was the City of New York, there was no need for the District Attorney to bring a vicarious section 715 proceeding; the City’s voluntary use of RPAPL 711 (5) obviated any such necessity.

. This six-week stay clearly demonstrates the Housing Court Judge’s belief that Wright posed no threat to other tenants in the building.

. For obvious reasons the record, which consists of proceedings before the Housing Court, is silent on this subsequently occurring event. In her motion papers, however, Wright explained that since her mother died in 1990 she had no relatives from whom she could seek assistance, or with whom she could stay. She also stated that she had been told there would be approximately a year’s wait in the shelter system before she and her children might secure permanent housing, whether in a City-owned building or otherwise with Human Resources Administration assistance.

. That the State of New York prosecuted the first action and the City of New York prosecuted the second is a distinction without a difference for the purpose of double jeopardy analysis. "Political subdivisions of States — counties, cities or whatever — never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions.” (Reynolds v Sims, 377 US 533, 575 [1964]; see, Waller v Florida, 397 US 387 [1970].) Petitioner-appellee has not argued to the contrary.

. Several tenants submitted affidavits; others spoke to Wright’s attorney but declined to sign papers for fear of becoming unnecessarily involved. It is significant that the tenants included both elderly persons living alone (the tenant of apartment 3E, who is 85 and has lived in her apartment for 45 years, the tenant of apartment 2W, who had resided there for 48 years) *580 and parents with small children (the tenant of apartment 5E, who has three children and who lives directly above Wright). These affidavits were submitted on Wright’s motion to dismiss on double jeopardy grounds and are properly before us on the appeal from the final judgment.

. Violation of Wright’s probation in this respect would almost certainly result in her incarceration, a penalty she has strenuously sought to avoid in order to remain with, and parent, her two small children.

. In Halper (supra) the defendant submitted 65 false claims for Government reimbursement in violation of the Federal Criminal False Claims statute. He was convicted and sentenced to prison and a $5,000 fine. Thereafter, based on the same facts, the Government was granted summary judgment in its civil suit against him under the Federal Civil False Claims Act. Under that act’s strict terms, he would have been liable for a civil penalty of $2,000 for each false claim plus the Government’s actual damages of $585, for a total of $130,585.
The Supreme Court analyzed the monetary penalty to determine whether it bore a rational relation to compensating the Government for its losses, including enforcement costs. Although only an approximation of "rough justice” was required, the Court found the civil penalty so disproportionate to the Government’s loss as to be punitive and/or deterrent rather than remedial, and so a constitutionally prohibited second punishment.

. Because there were already two vacant apartments in the building, it is far from certain that the City could easily rerent Wright’s apartment and secure rental income from it.

. A number of post-Halper (supra) Federal decisions have suggested or held that disproportionality analysis need not be employed where the forfeiture following conviction is an instrumentality of the crime (e.g., United States v Amiel, 995 F2d 367 [2d Cir 1993]; United States v McCaslin, 979 F2d 786, 788 [9th Cir], cert denied — US —, 113 S Ct 382, 121 L Ed 2d 292 [1992]). The Second Circuit’s decision in United States v Certain Real Prop. & Premises Known as 38 Whalers Cove Dr. (954 F2d 29 [2d Cir 1992] [Whalers Cove]) makes clear that the property on which drugs are sold (in that case a condominium) is not an "instrumentality,” although it may be sufficiently connected to prohibited drug activity to fall within the drug forfeiture statute. The City has not attempted to justify this eviction proceeding as seizure of an instrumentality, nor could it.

. The majority cites Property Clerk v Hyne (147 Misc 2d 774 [Sup Ct, NY County 1990], affd 171 AD2d 506 [1st Dept 1991]) for the proposition that the "clearest proof’ is required to demonstrate that the procedure employed here "[was] so punitive in effect as to negate its remedial purpose.” (Supra, at 574-575.) While I believe that even that burden has been met, it is not, after Halper (supra), the appropriate standard to apply; reliance on Hyne is thus inapposite. Hyne challenged a proceeding brought pursuant to Administrative Code of the City of New York § 14-140 seeking forfeiture of Hyne’s car after his criminal prosecution and conviction. In analyzing Hyne’s double jeopardy claim, the lower court relied on United States v Ward (448 US 242 [1980]) which, to the extent that it differs from the Halper analysis, was distinguished by the Halper Court. Although decided after Halper, Hyne did not mention that decision, and is thus inapposite. Examination of the briefs submitted to the Appellate Division reveal that neither party briefed Halper. Thus, neither Hyne court considered the Halper standard which rejects the requirement of "clearest proof’ in a case such as this. (United States v Halper, supra, at 448.)

. There is no evidence in the record below or in that of the criminal proceeding that drugs were ever actually sold in or from the apartment.

. The Court did not find it necessary to remand to allow the Government to attempt to rebut the presumption by "prov[ing] otherwise, through an 'accounting of [its] damages and costs’ ” (United States v Certain Prop. & Premises Known as 38 Whalers Cove Dr., supra, at 34, citing United States v Halper, supra, at 449-450), because defendant’s criminal conviction was the result of a State prosecution. Under the Federal "dual sovereignty doctrine,” the Double Jeopardy Clause is inapplicable when separate governments prosecute the same defendant, for the defendant has offended both sovereigns. (United States v Certain Prop. & Premises Known as 38 Whalers Cove Dr., supra, at 38, citing Heath v Alabama, 474 US 82, 87-89 [1985].)

. The City also argues that it is anomalous and unfair to hold it to a higher standard than a private landlord who, it opines, would be unfettered in its use of RPAPL 711 (5). This argument fails because as a matter of general constitutional principles the City has a higher duty than private landlords (see, e.g., 157 W. 123rd St. Tenants Assn. v Hickson, 142 Misc 2d 984 [App Term, 1st Dept 1989]). In addition, because of the interplay of RPAPL 715 and 711 (5) a "private” eviction following a section 715 notice from the District Attorney’s office might well constitute State action sufficient to invoke the Double Jeopardy Clause.

. It is also the rare tenant who will find the superb legal representation which Wright received here. Attorney Martha Rayner and the Neighborhood Defender Service of Harlem made an exceptional record below and appellate presentation here, both in the finest tradition of legal services offices in this City.